FORD MOTOR COMPANY v STATE TAX COMMISSION

1. TAXATION—PERSONAL PROPERTY TAX—STATUTES—AMBIGUITY—LEG-
ISLATIVE INTENT—PLAIN MEANING.

It is the function of a reviewing court to seek to effectuate the
intent of the Legislature when resolving cases involving dis-
puted interpretations of statutory language, but where a stat-
ute is clear and unambiguous on its face there is no room for
judicial construction and the statute must be enforced as writ-
ten; the plain meaning of the statute which provides two
methods by which inventories may be assessed for taxation
purposes is clearly that a taxpayer may elect to have its
inventory in one assessing district assessed by the tax day
method while having its inventory in another assessing district
assessed on the basis of the average monthly inventory present
in the assessing district (MCLA 211.13).

2. CONSTITUTIONAL LAW—STATUTES—COURTS—CONSTITUTIONALITY—
TWO INTERPRETATIONS—CHOICE.

A court is required to adopt that interpretation of a statute
which would render it constitutional where a statute is amena-
ble to two differing interpretations, one which would render it
constitutional and the other unconstitutional.

3. TAXATION—PERSONAL PROPERTY TAXES—UNIFORMITY—ASSESSMENT
—TERRITORY—VALUATION—CONSTITUTIONALITY—STATUTES.

Taxation must be done by a uniform rule or by an unvarying
standard which requires uniformity not only in the rate of
taxation, but also uniformity in the mode of the assessment
upon the taxable valuation; uniformity implies equality in the
burden of taxation which cannot exist without uniformity in
the mode of assessment as well as the rate of taxation and
which must be coextensive with the territory to which it

REFERENCES FOR POINTS IN HEADNOTES
[1] 73 Am Jur 2d, Statutes § 194 *et seq.*
[2] 16 Am Jur 2d, Constitutional Law §§ 144–146.
[3] 71 Am Jur 2d, State and Local Taxation § 150 *et seq.*
[4] 71 Am Jur 2d, State and Local Taxation §§ 136, 153, 162, 168.
[5] 72 Am Jur 2d, State and Local Taxation § 753 *et seq.*

applies, but the difference in the statutory scheme which allows valuation of inventories for assessment purposes by the average monthly method while requiring money and credits to be valued by the tax day method consists not in the rule or burden of taxation, but simply in the mode of ascertaining the valuation and, since all taxpayers similarly situated are entitled to make this election, the statute is constitutionally firm (MCLA 211.13).

4. TAXATION—PERSONAL PROPERTY TAXES—STATUTES—CONSTRUCTION OF STATUTES—INTENT OF LEGISLATURE—INVENTORIES—ELECTION OF METHOD—JUGGLING INVENTORIES.

The Court of Appeals will not adopt a strained construction of the statute permitting a taxpayer to elect the method by which his inventories will be assessed for taxation purposes which would deny this legislatively granted right to taxpayers merely because it is possible that some taxpayers may juggle their inventories as tax day approaches to decrease the overall amount of tax which must be paid.

5. TAXATION—PERSONAL PROPERTY TAXES—PROPERTY VALUE ASSESSMENT—COMPUTATION.

The proper method for determining the average level of property value assessment for a single taxpayer is to divide the assessed value of all taxable personal property in the assessing district, exclusive of the assessed valuation placed on that taxpayer's taxable personal property, by the true cash value of all taxable personal property in the assessing district, exclusive of the true cash value assigned to that taxpayer's personal property (MCLA 211.13).

Appeal from State Tax Commission. Submitted March 3, 1975, at Detroit. (Docket No. 19600.) Decided August 25, 1975. Leave to appeal applied for.

Ford Motor Company objected to its personal property tax assessment by the City of Highland Park and the School District of Highland Park and filed objections with the Board of Review of the City of Highland Park. Board of Review overruled objection. Plaintiff appealed to the State Tax Commission. Assessment sustained with revisions. Plaintiff appeals by leave granted. Reversed and remanded.

*F. A. Stocking* and *Loren M. Opper,* for plaintiff.

*Dickinson, Wright, McKean & Cudlip* (by *George E. McKean* and *Robert L. Schwartz),* for the City of Highland Park.

*Miller, Canfield, Paddock & Stone* (by *Samuel J. McKim III),* for the School District for the City of Highland Park.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Richard R. Roesch,* Assistant Attorney General, for the Michigan State Tax Commission.

Before: V. J. BRENNAN, P. J., and J. H. GILLIS and D. F. WALSH, JJ.

V. J. BRENNAN, P. J. Plaintiff, Ford Motor Company, appeals, upon leave granted, from a decision of the Michigan State Tax Commission and challenges the method used to assess the company's inventories in the City of Highland Park for the 1971 personal property assessment. The case is before us on the stipulated set of facts reproduced, in relevant part, below:

"1. Throughout 1970, taxable personal property owned by Ford Motor Company (hereinafter, 'Ford'), including inventories of goods, materials, merchandise, and supplies used in trade, commerce, and manufacturing, was situated in the City of Highland Park (hereinafter, 'City').

"2. On February 15, 1971, Ford timely filed a sworn personal property statement with the City listing all of its personal property situated in the City on December 31, 1970 * * * .

"3. On Item 6, page 1 of its sworn personal property

statement filed with the City, Ford showed an amount of $24,737,962, which was the true cash value of its inventories in the City on tax day, December 31, 1970.

"4. Ford did not list on schedule A1 of the sworn personal property statement filed with the City or elsewhere therein, the value of its inventories in the City for each of the preceding 12 months ending December 31, 1970.

"5. Schedule A1 is captioned as follows:

"Average Inventory Computation for calendar year 1970. If you intend to file an average inventory for Item 6, page 1 [inventory], complete the following schedule.

"6. Ford did complete schedule A1 of personal property statements submitted for 1971 to assessors of some of the other Michigan assessing units in which Ford had taxable personal property.

"7. On the basis of the personal property statement filed by Ford the City Assessor determined that the true cash value as of tax day, December 31, 1970, of Ford's taxable personal property, except inventories, situated in the City was $8,883,277.

"8. The City's Board of Review rejected Ford's election to have its inventories in the City on tax day valued by reference to their true cash value as of December 31, 1970, and determined that the true cash value of Ford's taxable property in the City on December 31, 1970, was the true cash value on tax day, December 31, 1970, of Ford's taxable property exclusive of inventories plus the average monthly value (for the preceding 12 months ending December 31, 1970) of Ford's inventories in the City.

"9. To effect the determination, the City's Board of Review

"a. estimated the average monthly value of Ford's inventories;

"b. added this estimated average monthly inventory value to the true cash value, on tax day December 31, 1970, of Ford's other taxable personal property in the City to arrive at a total which the Board of Review took to be the true cash value of the taxable personal property of Ford having a taxable situs in the City on December 31, 1970; and

"c. placed an assessment of $19,524,650 on all of the taxable personal property of Ford Motor Company in the City as of December 31, 1970, which assessment represented 50 percent of the amount which the assessor had determined was the true cash value of the taxable personal property of Ford.

"10. On March 9, 1971, Ford appealed its assessment to the Board of Review of the City.

"11. On March 15, 1971, the Board of Review notified Ford that it would make no adjustment in the assessment.

"12. On April 30, 1971, because the City's Board of Review valued Ford's inventories on an average monthly basis, Ford appealed the personal property assessment placed on Ford's personal property by the City to the State Tax Commission.

"13. At the April 1971, meeting of the Board of Commissioners for Wayne County within which the City is situated, it was determined that $75,450,500, the aggregate of all the assessments of taxable personal property within the City as determined by the City, did in fact represent 50 percent of the true cash value of all of the taxable personal property therein situated.

"14. At the May 1971, meeting of the State Tax Commission, sitting as the State Board of Equalization, it was determined that $3,056,624,621, the aggregate of all of the values of taxable personal property in the assessing units in Wayne County, as equalized by the Board of Commissioners for Wayne County, did in fact represent 50 percent of the true cash value of all of the taxable personal property in that county.

"15. Apportionment of this state equalized value of Wayne County to the City and thereafter among the individual personal property assessments as made by the City resulted in a state equalized value of $19,524,-650 for Ford's taxable personal property situated in the City. It was against this value that the City levied all 1971 property taxes on Ford's personal property.

"16. As a consequence of the assessment appeal submitted by Ford to the State Tax Commission, representatives of the Commission made an audit and determined that the average monthly value of Ford's inven-

tories situated in the City during the 12 month period ending December 31, 1970, was $29,648,553.

"17. There is no dispute between Ford and the City as to the true cash value of Ford's taxable personal property in the City on December 31, 1970, other than the true cash value of Ford's inventories. Both Ford and the City agree that, excluding inventories, the value of Ford's taxable personal property was $8,883,277, as determined by the City's assessor.

"18. There is no dispute between Ford and the City regarding the amount to be used if it is determined that, as a matter of law, Ford's election to have its inventories in the City assessed by reference to their true cash value on December 31, 1970 should be honored. In such event, both Ford and the City agree that:

"a. the true cash value of Ford's inventories was $24,737,962; and

"b. the true cash value of all Ford's taxable personal property in the City on December 31, 1970 was $33,621,-239 ($8,883,277 plus $24,737,962).

"19. There is no dispute between Ford and the City regarding the amount to be used if it is determined that, as a matter of law, Ford's election to have its inventories in the City assessed by reference to their true cash value on December 31, 1970, should not be honored and Ford's inventories should be assessed by reference to their average monthly value during the 12 month period ending December 31, 1970. In such event, both Ford and the City agree that:

"a. the true cash value of Ford's inventories is $29,648,553; and

"b. the true cash value of all Ford's taxable personal property in the City on December 31, 1970, is $38,531,-830 ($8,883,277 plus $29,648,553)."

MCLA 211.13; MSA 7.13 provides, in pertinent part:

"Inventories of goods, wares, materials, merchandise and supplies such as are commonly used in trade or commerce or manufacture shall, upon the filing by the owner thereof of a sworn statement with the assessing

officer showing the total of such inventories for each of the preceding 12 months ending December 31, be assessed on the basis of the average monthly inventory for such 12-month period. The average monthly inventory shall be computed on the basis of the number of months during which said inventories of goods, wares, merchandise and supplies had a taxable situs in the assessing district. No assessing officer shall be restricted to any particular period in the preparation of the assessment roll but may survey, examine or review properties at any time prior to or after said tax day."

The above statute provides two methods by which inventories may be assessed for taxation purposes. The first method requires that "all tangible personal property", including inventories, be assessed in the township in which they are located on the tax day, December 31. A second method is made available, however, at the owner's option and provides for assessment on the basis of the average monthly inventory located in the assessing district. The first issue presented for our consideration involves the question of whether, under MCLA 211.13; MSA 7.13, a taxpayer may elect to have its inventory in one assessing district assessed by the tax day method while having its inventory in another assessing district taxed on the basis of the average monthly inventory present in the assessing district. We hold that the statute here involved, MCLA 211.13; MSA 7.13, permits the taxpayer to make such an election.

MCLA 211.13; MSA 7.13 permits assessments to be made on the basis of the average monthly inventory "upon the filing by the owner thereof of a sworn statement with *the assessing officer* showing the total of such inventories for each of the preceding 12 months ending December 31 * * * ". The statute further provides that "[t]he average monthly inventory shall be computed on the basis

of the number of months during which said inventories of goods, wares, merchandise, and supplies had a taxable situs in *the assessing district*". As can readily be seen from the above quotations, this clause of the statute, insofar as it relates to the filing requirement and the inventories to be assessed, is phrased in the singular. No reasonable construction of these terms, standing alone, supports a determination that this statute requires the same method to be used in all districts.

In resolving cases involving disputed interpretations of statutory language it is the function of a reviewing court to seek to effectuate the legislative intent. *Aikens v Department of Conservation*, 387 Mich 495; 198 NW2d 304 (1972), *Dussia v Monroe County Employees' Retirement System*, 386 Mich 244; 191 NW2d 307 (1971). However, if the statute is clear and unambiguous on its face there is no room for judicial construction and the statute must be enforced as written. *Dussia v Monroe County Employees' Retirement System, supra, Ypsilanti Police Officers Association v Eastern Michigan University*, 62 Mich App 87; 233 NW2d 497 (1975). It is our considered opinion that the plain meaning of the statute is clear and that it permits a taxpayer to elect to have its inventory in a particular assessing district assessed according to the average monthly inventory without regard to the method selected in another assessing district.

Defendants argue, however, that this construction of the statute is unconstitutional under Const 1963, art 9, § 3, because it violates the constitutional principle of uniformity in taxation, and invokes the rule of statutory construction that where a statute is amenable to two differing interpretations, one which would render the statute constitutional and the other unconstitutional, a

court is required to adopt that interpretation which renders the statute constitutional. While we have no quarrel with this rule of construction, we find it inapplicable for two reasons. First, we do not accept defendants' argument that the statute is amenable to two different constructions. As we pointed out earlier, the statute is clear and permits the taxpayer to choose between the tax day and average monthly inventory method in each assessing district. Second, we do not perceive any constitutional infirmity present in this reading of the statute. In *Huron-Clinton Metropolitan Authority v Boards of Supervisors of Five Counties,* 304 Mich 328; 8 NW2d 84 (1943), our Supreme Court adopted the following language from *Exchange Bank of Columbus v Hines,* 3 Ohio St 1, 15 (1853):

"What is meant by the words 'taxing by a uniform rule?' And to what is the rule applied by the Constitution? No language in the Constitution, perhaps, is more important than this; and to accomplish the beneficial purposes intended, it is essential that they should be truly interpreted, and correctly applied. 'Taxing' is required to be 'by a uniform rule;' that is, by one and the same unvarying standard. Taxing by a uniform rule requires uniformity not only in the rate of taxation, but also uniformity in the mode of the assessment upon the taxable valuation. Uniformity in taxing implies equality in the burden of taxation; and this equality of burden cannot exist without uniformity in the mode of assessment, as well as in the rate of taxation. But this is not all. The uniformity must be coextensive with the territory to which it applies. If a State tax, it must be uniform over all the State; if a county, town, or city tax, it must be uniform throughout the extent of the territory to which it is applicable."

The Court in *Exchange Bank* went on, however, as plaintiff correctly points out, to discuss certain

arguments, one of which presented a constitu-
tional challenge, under the rule of uniformity, to
the statutory scheme of allowing valuation of in-
ventories for assessment purposes by the average
monthly inventory method while requiring money
and credits to be valued by the tax day method.
The Court there said:

"It has been argued that 'stock in trade' is subject to
a different rule of taxation from that which is imposed
on other property. This is a mistake. *The difference
consists, not in the rule or burden of taxation, but
simply in the mode of ascertaining the valuation.* This
principle of valuing by an average has been introduced
because stock in trade is constantly changing the article
of its investment, and varying in the quantity on hand,
from month to month.

"The constitution placed 'moneys and credits' on
precisely the same footing, and subject to the same rule,
as a basis of taxation, with all other taxable property,
real and personal." *Exchange Bank of Columbus v
Hines, supra,* at 19. (Emphasis added.)

The cases relied on by defendants, principally
*Teagan Transportation Co v Detroit,* 139 Mich 1;
102 NW 273 (1905), *Ready-Power Co v City of
Dearborn,* 336 Mich 519; 58 NW2d 904 (1953), and
*Titus v State Tax Commission,* 374 Mich 476; 132
NW2d 647 (1965), do not require a different result.
Aside from the fact that *Ready-Power* is factually
distinguishable from the case at bar, the language
therein relied on by defendants is merely dictum
and in no way binding on this Court. Similarly,
under the statute here involved all taxpayers simi-
larly situated, namely those having inventories "of
goods, wares, materials, merchandise and supplies
such as are commonly used in trade or commerce
or manufacture", are entitled to make the election
provided by MCLA 211.13; MSA 7.13 and are thus

treated in the same fashion. This was not the case in *Titus.* Furthermore, we find *Teagan* to be totally inapposite to the facts of the instant case.

It is also argued that this construction of the statute will permit a taxpayer to juggle his inventories as tax day approaches so as to decrease the overall amount of tax which must be paid. If this problem should result, the solution lies in the proper enforcement of the law and not in this Court adopting a strained construction of the statute which would deny this legislatively granted right to non-offending taxpayers. Indeed, the Legislature, in this section itself, has provided a means by which such abuses can be guarded against. The last sentence of this section, MCLA 211.13; MSA 7.13, provides:

"No assessing officer shall be restricted to any particular period in the preparation of the assessment roll but may survey, examine or review properties at any time prior to or after said tax day."

Plaintiff's final issue relates to the manner in which the value of their property was assessed. Plaintiff contends that the average level of assessment should be determined without reference to the value of their property or the amount at which their property was assessed. We agree. *In re Appeal of General Motors Corp,* 376 Mich 373, 380 fn 5; 137 NW2d 161 (1965), our Supreme Court said:

"We assume that in determining the weighted average of all property, real or personal, the property of General Motors was not a significant factor. In the event that it would affect the weighted average, it should be excluded. See *Kingsford [Chemical Company v City of Kingsford,* 347 Mich 91, 105, 107; 78 NW2d 587 (1956)]."

This approach was later followed by another panel of this Court in *Hoerner-Waldorf Corporation v Village of Ontonagon,* 26 Mich App 542; 182 NW2d 759 (1970).

The revised value of plaintiff's property in the assessing district here involved comprises approximately 23 percent of the value of all property located therein. This clearly is a significant factor in determining the average level of assessment.

We disagree, however, with the method plaintiff would use to determine the average level of assessment. The proper method for determining the average level of assessment is to divide the assessed value of all taxable personal property in the assessing district, exclusive of the assessed valuation placed on Ford's taxable personal property by the commission, by the true cash value of all taxable personal property in the assessing district, exclusive of the true cash value assigned to Ford's taxable personal property by the commission.

Reversed and remanded for the entry of an order consistent with this opinion.